The opinion of the Court was delivered by
Johnston, Ch.
Assuming the defendant’s right of appeal from Chancellor Dargan’s decree — which as it has not been contested here by the counsel on the other side, — the Court is not disposed to deny; then, it is of little consequence whether that decree has been properly construed by the master or not.
I am satisfied that if that decree has not upheld the defendant’s right to the security of the mortgage for subsequent advances, it should be reformed, so as to give him that security.
We may entertain our individual opinions as to the policy of allowing such securities to be taken. But the legality of taking them is too well established by decisions, to allow us, now, to act upon our personal impressions. I need not refer to cases in our own Court. The same principle is admitted at law. Nor is it confined to special liens, such as mortgages; but obtains, also, where a general lien, such as a judgment has been voluntarily given to secure future advances, and to make sure the eventual balance in favor of the creditor. Bonds (and if a higher security were added to them, that, also,) given for *285 official conduct, are nothing but a security given for an eventual balance, dependent entirely upon the future conduct of the obligor, and, therefore, within his power as to increasing or diminishing the amount ultimately to be established under the instrument. A mortgage, or a judgment taken for indemnification by the surety of an administrator or guardian at the time he becomes surety, has never been doubted to be a good security to him, and may enure to the benefit of the estate:— and, if good at all, can only be good for future transactions.
The Chancellor, by his decree of 1850", having established that the execution of the mortgage was fair, and that it was not executed for a fraudulent purpose, — it follows that it should be allowed to accomplish the purpose which it professes on its face: which was to indemnify the mortgagee not only for debts then existing, but for future advances.
But although an instrument may be free from fraud in its inception, it is not to be used for fraudulent purposes: and if any thing of that kind is done, or attempted, no doubt this Court will overrule it.
The defendant, Fleming, has been charged the full amount of what he has received under the mortgage and from the mortgaged goods; and should be allowed every expenditure he made, which, as between himself and his mortgagor, was good'; unless the expenditure was intended as a fraud upon some other creditor.
I shall first select the expenditures made by Fleming after the bill was filed, which he claims as credits.
The bill was filed the 18th September, 1848; after which the actual expenditures set down in the report amounted to six hundred and seventy-one dollars and forty-four cents. Of this sum the Master has allowed three hundred dollars for the expenses of sustaining the bona Jides of the mortgage; and as no appeal is taken from this part of the report, it is not drawn unto review before us. The same may be said of the further *286 sum of thirty-four dollars and thirty-one cents, allowed on the interest account. This is not drawn in question; and, besides, it is not properly in the nature of an expenditure, but a mere adjustment of the interest on the account as it should be settled: which is all very proper.
So far, all is well enough. Then the Master rejects the sum of twenty-nine dollars and three cents, charged as paid to Layton for services. He reports that there was no proof of any consideration for the payment. Surely the master was right in requiring sueh proof for an expenditure after the bill was filed. The defendant was not at liberty to expend the money for which the bill was filed, without showing some necessity for it, such as would justify it in the eyes of the Court.
Another expenditure after the bill, was one hundred and twenty-seven dollars and fifty-nine cents, paid over to Hay himself, the insolvent debtor. If such a payment were sustained, it would be so easy to defeat such a bill as this, that it would he the merest folly in parties to file them, — and the merest mockery in the Court to profess any jurisdiction to sustain them.
Thus, it appears, that the master has properly overruled credits, in favor of Fleming, after bill filed, to the amount of one hundred and fifty-six dollars and sixty-two cents, and sustained others to the amount of three hundred and thirty-four dollars and thirty-one cents.
With all this we are not dissatisfied. But, then, there remains an expenditure made the 20th September, 1848, two days after bill filedbeing one hundred and eighty dollars and fifty-one cents, paid on Day’s note in bank. This must be regarded as a voluntary payment, intended to overreach such decree as might eventually be made in the case; and, therefore, fraudulent — and the master properly rejected it.
Then we come to the expenditures before the bill, which were objected to by the plaintiffs, and ruled out by the master:—
*287 1. 17th May, 1848, amount paid on Day’s note in book, indorsed by Eisher, $324 98
2. 15th July, 1848, amount paid on Day’s note in book, indorsed by Eisher, 257 35
$582 33
The master disallowed these sums, not because they were not expended by Fleming, for that was conceded, — but, as he reports, because Fleming was no party on the notes, — and so not bound to pay them.
The very object of the mortgage, was in part to secure future voluntary advances. And such a purpose has been pronounced good as between the parties, and good as to creditors if the purpose was not to defraud, delay, or hinder them. The legal title of the property covered by the mortgage was in Fleming, but he was under an equitable obligation to Day, his mortgagor, to account to him; and if the money arising from the mortgage was applied to fay creditors of Day, it was certainly no fraud on them,: nor on any other creditors, unless the preference given to those who were paid was a fraud. But a mere preference among creditors has, over and over again, been ruled to be no fraud.
In my opinion a mortgage or other special lien, or security, stands upon a very different footing from a general assignment made by a debtor for the payment of his debts. In the latter case any interest reserved to the assignor, or the reservation of a power of control by him, vitiates the instrument, and falsifies what it professes to be, a surrender of all the party’s property for the payment of all he owes. But in every special lien, directly the contrary is intended. The intention is only to secure a particular party, — with an open reservation of every interest, beyond that purpose, to the party giving the lien.
To him the party taking the lien is accountable, and to him he must account, until some other creditor interferes, and by *288 properly impleading those parties, enables the lien holder safely to hold his hand. The payment of these notes stood upon the same footing as if Day had given an order to pay the bank; or as if Fleming had purchased up the notes to enable him to settle with Day.
From the time of bill filed the matter stood upon a different footing; but before that time, I see no fraud in the ease.
It is ordered that the decrees appealed from and the master’s report be reformed agreeably to the foregoing opinion; and in all other respects affirmed.
Dunkin, Dar&an and Wardlaw, CC., concurred.

Decrees reformed.